Judge Buckner,
delivered the opinion of the court.
John Middleton died in January 1817, leaving Sarah, his widow, three sons, Thomas, Mathew and Robert, and two daughters. At his death, he owned among other properly, a slave named Jinny, and her children, Maria, Rap and Lewis. His son Thomas administered on his estate; and with the consent of the wi dow, Sarah Midleton, (who was entitled to dower in the estate of her deceased husband,) and of all his brothers and sisters, purchased the slaves aforesaid. Thomas Middleton after that, sold Jinny and two of her children, Lewis and Orange, to his brother Mathew, who sold them to Robert Middleton. While he, Robert, had Jinny in possession, she had two other children* *144 In September 1822, Robert died, and Thomas became the administrator of his estate also. He caused aii appraisement and inventory of his brother’s estate, to be made, and returned to the county court, shortly after his death; including the slave Jinny, and her children, which Robert had claimed; Robert Middleton .left three infant children his heirs at law, and in 1824, his widow married Carroll. The slaves had remained from the death of her deceased husband, in her possession, until the fall of 1824, whén the administrator 'took them to his house, claiming them as his own. Carroll and wife then instituted this suit in chancery, making them and the infant children of Robert, defendants, claiming her right of dower in the slaves; praying, that it might be assigned to her, and the others allotted to the said heirs. They exhibit as a part of their bill, a bill of sale for the skives from Mathew to Robert, dated the 5th of August, 1818, which purports to have been made in consideration of $>1000;
The administrator answered, insisting, that the 'slaves belonged to him individually. The nature of his title to them, is represented in his answer, in this way. When he bought them, on the sale of his father’s testate, his mother, by an agreement between her, his brothers and sisters and himself, was to be provided for, out of the proceeds of the sale, in lieu of her right of dower in them. Having purchased them, she and himself entered into a written contract, by which it was agreed, that she should keep possession during her life, of Jinny, with Lewis, and Jinney’s future increase, in lieu of her right of dower, in the slaves, which he had purchased. The writing was kept by his mother, and had been lost or mislaid. After said sale, his mother, with whom he had left them, came to his house to live, ■ he agreeing to take care of her. After some time, being dissatisfied, she went with her said slaves to live with his brother Mathew, who agreed to support her, for the use and labor of them. He and Mathew then entered into a contract, by which, he let him have Jinny and her children, except the two oldest, and got in exchange for them, another negro woman named Betty; but with this condition, that if his mother became discontented, and refused to live with him, or he, Mathew, should become pressed for money, Thomas should have Jiriny and he'r children again; and pay *145 '$¡600, for the woman, which he had received in exchange Tor them. His mother did not remain there long, and Mathew being unfortunate in the sale of a drove of horses, which he had purchased and sent to market, demandedfhe $600 for Betty, which he paid, and thus the contract between them was cancelled. His mother, then went to the house of her son Robert to live, carrying with her said slaves, lie having purchased them 'from Mathew.
When Robert died, his mother was living; and he was advised, that it would not injuriously affect his claim, to hfve the slaves áppraised as a part of his brother’s'éstate. As soon as his title accrued, he took possession of them. He relies also, on his right of possession as administrator; prays that his answer may be considered as a cross bill against the complainants-, and heirs of said Robert. The infant children of Robert Middleton answered by a guardian ad litem, signifying their consent to the claim of their mother, and insisting upon the justice 'of their claim to the slave, and the fraudulent nature of that, set up by the administrator. They deny, that in the sale of them; from him. to their uncle Mathew, there was any condition; insist that the salé was absolute upon a fair and full consideration, to-wit: the négro woman, Betty, and several hundred dollars which was not returned; nor the contract, in any way cancelled. Their father had purchased them, at the price of $1000; which had been paid. They rely upon the length of their possession, and of those under whom they claim; and pray that the slaves may, by the decree of the court, be divided amongst them. Carroll and wife answer in thé same way-. By an amended bill, the administrator charges, that the bill of sale from Mathew to Robert, was á forgery; which by the answers of the others was denied’.
The complainants then amended their bill, alleging that Thomas Middleton, as administrator of the estate of his brother Robert, had got all his papers into his possession; and was dishonestly concealing such .as ■Were calculated to affect his pretended title injuriously; whilst he exhibited those only which he thought would operate favorably to him. That he had also, possession of the papers left by his mother, which he was using is the same way.
*146 They demand the production of an obligation ey-ecuted by Robert to his mother, binding himself to support her; of that from the defendant, T. Middleton, to her, for a similar purpose, alleged to have been returned to him, when he sold the slaves in Mathew. They also state, that they had been informed, the defendant said he had a bill of sale from said Mathew, for one of the children of Jinny, named Orange; which together with that for Betty, if he had such papers, they require to be filed.
In answer to these allegations, he dañes, that he had any of Robert’s papers relating to this Ratter; says, that the writing respecting the contract between himself and Mathew, had been destroyed, when the recantation of their bargain took place; and that he. would produce the bill of sale for Betty, if he could find it; his contract for Orange had no connexion with the other sale; but if he was bound to do it, he would producethebillofsale,which hehadforhim, also.
At the December term, 1827, the cause was submitted to the circuit court, upon a final hearing. In Jan- ' uary, 1828, the heirs of Robert filed in the clerk’s office 'as' an appendage to the suit, a bill against the administrator, and one Stagner, alleging that Carroll had sold his wife’s right of dower to said Thomas, who then had the possession of the slaves; had sold one of them to said Stagner, who was a non-resident of this state, and was in the act of removing the slave so purchased, beyond ifsjurisdiction;upon which, the judge in vacation, granted an order, restraining each of them, from proceeding in their attempt, to carry off said slave.
At the May term, 1828, the defendant, Thomas, offered to file an answer to this bill, claiming nothing ■ more than a re-assertion of his claim to the slaves, which the court refused to let him file, and he excepted •to the opinion. A decree was then entered, in favor of the complainants and said infant heirs, appointing ■commissioners to assign to Mrs. Carroll her dower, :in the slaves in contest, and the others to the neirs, to 'reverse which, the administrator prosecutes this appeal; ■assigning errors, which question the correctness of the 'decree on its merits; and also, as to its details.
The depositions in the cause represent this case in ■very different points of view. But upon a careful exam *147 ination of the record, we are entirely convinced, that the claim of the appellant is unfounded. According to his own statement, in relation to the contract between himself and mother, at her death, he was entitled to the possession of the slaves. That event occurred in Nov. 1823; yet he is silent on the subject of his claim, until the fall of 1824; and then, we presume, obtained the possession of them clandestinely; for it does not appear, that for several years, he had said a word about his pretended claim, nor until he had taken them in October, 1821. lie had caused them to be appraised, as the property of his brother’s estate, and in that way returned an inventory to court; when afterwards, he took possession of them in his individual right. Wade,one of his own witnesses, swore, that he- told him he had done so, for the benefit of his brother’s children. The same-witness, upon further examination, attempted to weaken the force of this statement, by saying, that in the same conversation, the appellant claimed, the-slaves as his own. But that explanation was furnished' for him, by the appellant, in interrogatories propounded by him, in a shape, strongly indicating the required answer. To another witness, John Campbell, he. observed that he did not know, he should ever have asserted his claim, if his brother Robert had lived.
Inventory re- or'admito'r county court, evidence in against eir°r oradm’r.
ifaam’rha» included a ?lave in tho estate, evi-demm, to es-ofadm’rM-10 terwardsset up to sa°h hk ■ should be very clear and sa-hsfactory.,
Whether the inventory returned under the sanction of his oath as true, should be considered as absolutely con-elusive against his claim, we have not considered it necessary to determine. If it be not, the evidence ficient to obviate its eifect, should be of the most clear and satisfactory character. The 38th Sec. of the act of 1797, declares that it shall be evidence in any suit, by or against an executor or administrator; the cases excepted, in which it is said, it shall not be con-elusive, are, where other testimony may be given, that the estate was really worth, or was bona file sold, for morc or less, than the appraisement. It is at least suf-licient to place on him, the burthen of proof resisting it. That Robert purchased the slaves of Mathew, when the bill of sale from the latter to the former hears date; that the purchase was made upon a full consideration paid; and that from that period until the fall of 1821, he, or his family, were in the uninterrupted possession of them, under claim of absolute title, is rendered too apparent by the proof, to admit a doubt. But *148 the depositions on the part of the appellant and appeS-^ees’ are very discordant with respect to’ the nature of the contract between him and his mother, and of that between him and Mathew. Not only the proof on the part of the appellees and appellant, is contradictory; but material parts of that introduced by the latter*, are irreconcileable. with each other.
He attempts by various witnesses, to support the allegations of Iris answer, by which he insists that his mother had a life-estate in the slaves; and thereby to, obviate the operation of the statute of limitations. As to his unqualified right to the slaves, under his purchase, at the sale of his father’s property, there is no controversy. His purchase was unconditional. The creation of a life-estate must, therefore, depend upon the terms of the contract, between him and his mother; which he insists were reduced to writing. Several depositions were taken by him, not to prove, the contents of that instrument; but what Mathew and Robert had acknowledged, respecting their mother’s interest in the slaves..
One witness, stated that Robert had said, in his presence, shortly after his purchase, his mother was entitled, to them, for life; and then in answer to a question by the appellant, whether he had or had not frequently heard Mathew Middleton say, before he sold the negroes to Robert,, that his mother had a life-estate in them, replied, that he had. Some others also state the confessions of' Matthew and Robert, (omitting to. designate, the time when they were made,) that their mother was entitled' to the slaves as long as she lived. This testimony, of a character the weakest and least satisfactory of any, which, is at ail admissible, is illy calculated to elicit credence, from the manner, in which the slightest perusal of the depositions containing them, will show it was extracted.. The weight of the proof in the cause, which it is not necessary minutely to, de.tail, leaves but little, if any doubt, that there was no. executed transfer of a life-estate from the appellant to his mother, in any of the slaves; but that the contract between them was executory, evidenced by a covenant from him to her, binding himself to support her for life, and to permit the slave Jinny, to wait upon her during the whole of the time. That she had a right to hire Ihe slave to any other person, or to prevent her son. *149 from the use of her labor, when she did not stand in need of her services, as a waiting maid, cannot be supported with the slightest plausibility. This contract embraced none of the slaves except Jinny. It was proved, that her son offered to. furnish her another slave in lieu of Jinny, to which she replied, she was acquainted with her and preferred her to any other slave. The appellant took off the two oldest children; Lewis, the youngest, could have been of no service, and was left with his mother, we presume, on account of his tender age. The future increase of the slave would have been still more useless to Mrs. Middleton, who was then far advanced in life.
It was also proved, that the appellant declared he never would separate the slave Jinny from his mother; showing thereby his own conviction, that he had not parted with the title to her.
The testimony of Mitchell is, upon this point, conclusive. He acted as crier at the sale of the slaves when the appellant purchased them, and wrote the covenant from him to his mother. That writing ought to have been produced. If it was lost or destroyed, proof of its contents, by the man who drew it, and probably witnessed it, for it does not appear who- the witnesses to it were, is more to be relied on, than the alleged acknowledgments of Robert and Mathew.
This witness swore, that the contract contained in said writing was, that the appellant should support his mother, during life; furnishing her a room to live in, and letting her have Jinny to wait upon her.
He does not say that it contained a word about Lewis or Jinny’s future increase. As a further evidence, that he considered it as creating no investiture of a life-estate, his own witnesses proved, that after Robert had purchased her, and the children, he went with his wagon to. Mathew’s, with the, intention of taking them to his house; although he knew, that his mother was not again to live with him. That he had sold them to Mathew, and received in payment the price agreed upon, is also fully established. That the sale was conditional, although he introduced proof to that effect, cannot be conceded as satisfactorily supported. His declarations as related by some of the witnesses respecting this matter, are at *150 war with liis answer; and his witnesses upon the same point contradict each other.
At one time, he insists that the sale was conditional, at another, he admitted, that he bad sold, but he had repurchased them. The condition insisted upon, and which he attempts to support by some of his depositions, that if -Mathew did not succeed well in the sale of a drove of horses, which he had sent to mrlcet, he should pay $¡000 for Betty, and retain his interest in the slaves in controversy, is evidently a mere pretence; as is also the allegation, that he had paid the $600 for Betty. lie does not deny, that he received an unconditional bill of sale for the last mentioned slave; and that he executed to Mathew an instrument of writing concerning the slaves sold to him; but he says, upon the cancellation of the contract, they were destroyed; yet he still retained the bill of sale from Mathew, and had one for Orange, also, which he had kept concealed, until the complainants heard of it, and called for its production, j le then reluctantly produced it, saying, that if bound to do it, he was willing to exhibit; but it did not prove its execution, although he took the deposition of the subscribing witnesses to it. His response on this subject seems to be in strict accordance, with that disposition for evasion, which has marked his steps throughout the whole of this transaction. It is very improbable, that, as he had sold the slaves to his brother, who had them in possession, claiming them as his own, from the time of their contract, he would haye been satislied, with merely destroying the writing, retaining no evidence of the rescisión of the contract, nol-is it probable that Mathew would have been willing to permit him to retain the bill of sale for the slave which be had let him have in part payment, in the exchange of the negroes, without taking a bond for the payment of the $000; or calling upon a witness to the contract.
Mrs. Sarah Middleton -went to live with her son Mathew, carrying with her, Jinny and children, in the latter part of the winter, or commencement of the spring of 1818. About that time, the contract of sale took place between the appellant and Mathew; and that there were no such conditions, in the sale as those which he has attempted to establish, concerning Mathew’s success in the sale of horses, is manifested by that part of the proof, which shows, it was not until *151 near tlic close of the year 1818, that he purchased the horses which he sent off: and it does not appear, that he had conceived the design of purchasing any until long after the contract about the slaves. The appellant’s answer in relation to the price which he received from Mathew, and indeed as it respects the whole contract, is very different from the~statement of some of his witnesses. The appellant’s statement is, that the consideration received by him was the slave Betty, at §600. Ills witness, Miller, proves, that Mathew told him, he had agreed to give $600, and had let the slave mentioned, go, in part payment, at the price of $900. If his mother should not continue to live with him, lie had agreed to give the appellant something in lieu of her support; but the witness did notrecollecthowmuch it was.
Unconditional salo of slaves, where possessioh re» mains with vendor, is pef se fraudulent against creditors and pur* chasers.
With respect to the alleged payment of $600, by him to Ma thow, as the price of the slave Betty, wo cannot, even upon the statements of his witnesses, repose cpnlidencc in it, as true. They do not pretend that it was made until so re time after August, 1818; and their depositions are too inconclusive and contradictory, to be worthy of credit. It cannot be reasonably believed, that if Matthew had acted so dishonest^ It, as lirst to rescind the contract with the appellant, and then sell the slav es to Robert, he would afterwards have paid him the $609 promised. By retaining it, he would have been safe. But that he should have paid it, without taking a receipt, or at least calling on witnesses to notice it, is utterly incredible. Had he proved the payment to hare been made previous to the sale to Robert, there would have been more plausibility in the assertion.
But had it been clearly shown, that he had unconditionally repurchased the slaves and paid for them, ata much earlier period; still the possession of them remaining with the vendor, and being inconsistent with the terms of sale, was per nr, fraudulent against creditors, and purchasers. The possession remained with the vendor under a claim, which he continued to assert, and that known to the appellant.
This doctrine has been so long and fully established by the decisions of the supreme court of the union, and by the decision* of this court, that it is needless to cite authorities in supporl of it.
Five years adsion of slaves by vendee, and those der'him under an unrecorded conditional ■bars reconeree of them by61"5" vendor, nor ■will notice to from vendee ' ofthecondition in such conditonal sale,enable Vendor to re-slave from such purehas’r
We have already declared our disbelief of the alié-'gations by the appellant, that the sale from him, to his was conditional; nor do we admit that had such been the fact, it could hare rendered valid his claim.
The possession of the slaves was with Mathew; claiming them as his own property, and has been con-huiued him, and those claiming under him, for more than five years previous to the fall 1824, when the appellant set up his‘claim; and in his individual right, tc,ok Possei5si°n °f them. It is not pfentended, that any writing, 'setting forth the condition, has been admitted to record; and under such circumstances, it must be considef6d as a fraudulent attempt against the rights of creditors and purchasers* It is 4 case within the provisions of the statute against frauds and perjuries; and uoüce'óf his claim or of such condition, by Robert,'caxr-not purify a transaction, which the law declares to be vicious. See the case of Withers vs. Smith, IV Bibb, 172, and of Craig vs. Payne, same volume, 337. The ®rst cited case related to the -pretended or fraudulent loan, where the rights of a creditor were concerned; but the samé doctrine is laid down as applicable to & purchaser, in the case of Ferguson and others against White, I Marshall, 6. There was nothing improper in the refusal by the court, to permit the appellant to file an answer at the May term, 1828. No new fact had been charged, in the billor petition hied by the appel-lees, during the vacation which could in any respect bear upon the decision then about to be pronounced. The effect of the chancellor’s order, was confined to the single object of preventing a removal of one of thé slaves in controversy beyond the jurisdiction of the 'court.
The decree of the circuit court was correct, so far as it decided in favor of the justice of the claim, by the heirs of Robert Middleton, and of the right of Mrs. Carroll to dower. But it was erroneous, to direct the distribution to be made, until a bond with surities was executed by the appellee to refund as required by the statute on that subject; see vol. I Dig. K. L. 532, and the case of Prewitt’s executors, vs. Prewitt’s heirs, IV Bibb, 266.
Crittenden, for appellant; Ewing and Denny, Hot ap-pellee.
The decree is therefore, reversed with costs, and the 'cause remanded with directions, to rectify the error pointed out.